## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Orlando, Florida

JOHN DOE, M.D.,

        Plaintiff,

vs.                      **No.:** 6:19-cv-02074-PGB-LRH

ALEX M. AZAR II, Secretary, U.S.
Department of Health and Human Services,
and his Successors,

        Defendant.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO

## DEFENDANT'S MOTION TO DISMISS

Plaintiff John Doe, M.D., files this Response in Opposition to Defendant's Motion to

Dismiss [Dkt. No. 9], and states:


### I.      Procedural Background

1.     This case involves a false adverse report to the National Practitioner Data Bank

("NPDB"), which is maintained and controlled by the Defendant federal agency, the

Department of Health and Human Services ("DHHS").  The false adverse report was filed by

the physician's former hospital, Palmetto General Hospital ("PGH"), after Dr. Doe advised

he was not returning to the hospital after a medical leave of absence.

2.     The NPDB has rules for challenging such reports and for maintaining the

NPDB.  It is undisputed that PGH submitted the adverse NPDB report without cause and

without affording Dr. Doe the right to a hearing, as well as other rights guaranteed by law. The Plaintiff physician has exhausted his administrative remedies and now seeks judicial review in accordance with the Administrative Procedures Act.

3.     The NPDB report was filed without cause because there was no formal or informal investigation of Dr. Doe's PGH clinical privileges when Dr. Doe resigned. Contrary to the assertions of the Defendant, Dr. Doe did not surrender his credentials while under investigation. At the time of his resignation, PGH had already completed its review of the timeliness of Dr. Doe's completion of medical records, a matter which is not ordinarily grounds for adverse clinical privileges actions against a physician to begin with.

4.     The hospital's inquiry had been completed, finding that Dr. Doe's timeliness in completing medical records was outside the prescribed standards under the medical staff bylaws. The hospital closed the investigation and as a final peer review action, placed Dr. Doe on a corrective action plan under which his future medical records were to be reviewed for timeliness moving forward.

5.     Even if this were considered to be an "investigation" in its worst case, it would not have led to adverse clinical privileges action by the hospital nor a report to the NPDB, pursuant to the medical staff bylaws.

6.     Dr. Doe had gone on medical leave from PGH, during which time the collegial review of his records was obviously suspended. After several months of medical leave, Dr. Doe had recovered and sought to return to the hospital from his medical leave.

7.     At the same time, he was making inquiries concerning better jobs closer to his home.  After notifying the hospital that he desired to return from his medical leave of absence, he received a more attractive job offer in a different city in Florida.  Dr. Doe then notified the medical staff of PGH that he had accepted a different position and resigned from the medical staff of PGH.

8.     At no time did PGH inform Dr. Doe that he was under any type of investigation while he was on his medical leave of absence nor after he notified PGH that he desired to return from it.

9.     All indications showed that Dr. Doe's performance issues had all been resolved with peer review of his record submission timeliness and the corrective action plan prior to his medical leave of absence.

10.     PGH and its medical staff failed to provide Dr. Doe with any notice or any opportunity for a hearing prior to expiration or termination of his privileges, as mandated by the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq. ("HCQIA").

11.     Furthermore, there is no logical explanation of why an event and proceedings that would never have resulted in an adverse NPDB report, even if there had been due process given, could somehow be converted into events and proceedings requiring an adverse NPDB report merely by the physician's resigning.

12.     When Dr. Doe received notice of the adverse report directly from the NPDB, he entered the HCQIA-prescribed process for challenging adverse NPDB reports.

13.     The first step in that process was a request to the hospital that it remove the adverse report that it had submitted.  Pursuant to 45 C.F.R. § 60.21(b), Dr. Doe also informed the Secretary of DHHS that he disputed the adverse NPDB report and asked that it be placed in "disputed status."

14.     Dr. Doe entered discussions with PGH to resolve the dispute as required by 45 C.F.R. § 60.21(b)(3).  PGH declined to remove or correct the report.  Following the PGH denial, Dr. Doe escalated the matter to the Secretarial Review stage pursuant to 45 C.F.R. § 60.21(b)(3) & (c).

15.     Dr. Doe disputed the accuracy of the NPDB report because the report incorrectly stated that he had resigned his clinical privileges while "under investigation" for "professional competence or conduct."

16.     Following the secretarial review, DHHS denied Dr. Doe's request to remove or correct the adverse report.  DHHS's denial is dated July 31, 2018.

17.     Dr. Doe later challenged the incorrectly submitted report by filing a Privacy Act request with DHHS.  However, that too was denied on March 28, 2019.

18.     The present suit challenges the final agency action denying Dr. Doe's request to remove or correct the adverse action report and seeks other specified relief related thereto.

## MEMORANDUM OF LAW

### I.      Defendant's Motion to Dismiss is Premature

Central to the Court's determination of any of the issues presented by Defendant's Motion to Dismiss is the Court's determination as to whether or not Count III of the Complaint is well founded.  With the exception of Count IV, the issues presented in reviewing the agency's final decision with respect to Dr. Doe's NPDB Dispute Resolution request, and the reconsideration of it, are prerequisites to the Court's decision on the remaining counts in the Complaint.

In short, the Court cannot decide the Motion to Dismiss with respect to Counts I, II, V, and VI without first determining whether the agency applied valid laws and/or regulations, and whether those laws/regulations were properly applied to Dr. Doe's case.  This is the cause of action that the Plaintiff has set forth in Count III of the Complaint.  Furthermore, Count III has not been challenged by the Defendant in his motion to dismiss.

By way of example, Count I of the Complaint charges Defendant federal agency with:

                (i)  adopting a non-rule policy in violation of the Administrative Procedure Act; and

                (ii)  acting in excess of the agency's grant of statutory authority.

Central to a determination on these issues is whether the final agency action was proper, including a determination as to whether the rules and policies relied upon were validly

promulgated and were applied in a manner consistent with the agency's authority and its mandate under the applicable federal statutes.

The remaining counts contain overlapping legal issues which are inextricably intertwined with a determination as to whether the agency exceeded its statutory authority.

Until the Court passes on this issue directly, a decision on the remaining counts of the Complaint is premature.  For these reasons, Dr. Doe respectfully requests the Court stay a decision on Defendant's Motion to Dismiss until such time as judgment is rendered on Count III through separate motion.  Count III has not been challenged by the Defendant in the present motion.

## II.  Dr. Doe Was Not Under Investigation at the Time He Resigned His Privileges

There was no formal investigation pending of Dr. Doe at the time he resigned from PGH.  [Dkt. No. 1, ¶ 29].  On October 6, 2014, PGH opened an investigation on Dr. Doe for delays in completing medical records.  [Dkt. No. 1, ¶ 24].  On October 15, 2014, PGH concluded its investigation and found that Dr. Doe was not timely in completing his medical records, placed him on 100% case review, and required Dr. Doe to complete Cerner[1] training.  [Dkt. No. 1, ¶ 25].  On January 21, 2015, the Credentials Committee for PGH ("Committee") recommended ceasing the concurrent monitoring of Dr. Doe.

---

[1]    Cerner Corporation is an American for profit corporation and a supplier of health information technology services.  Physicians can take Cerner training in order to improve their ability to use electronic medical record software.

On September 2, 2015, the Committee opened an inquiry into Dr. Doe's medical records and determined that they were not being completed by him in a timely manner. On September 16, 2015, Dr. Doe met with the Committee. [Dkt. No. 1, ¶ 27]. The Committee had concluded that Dr. Doe's medical records were not being completed in a timely manner and, as final peer review action, put Dr. Doe on 100% review of his medical records for timeliness. [Dkt. No. 1, ¶ 28]. However, this was not an adverse clinical privileges action and it is not the type of action that would result in an adverse NPDB report against the physician.

In a letter dated September 23, 2015, the Committee informed Dr. Doe:

> **<u>After thorough review</u>** the Committee assigned Q2 (Opportunity for Improvement) and B2 (Behavior with Opportunity for Improvement) to this matter.

[Dkt. No. 1, ¶ 28]. (Emphasis added.)

On October 7, 2015, the Committee reviewed Dr. Doe's progress and concluded that his medical record timeliness was improving, but continued review was necessary. On October 13, 2015, Dr. Doe requested a medical leave of absence, having discovered that he possibly suffered from a medical ailment that contributed to his ability to timely complete his medical records. [Dkt. No. 1, ¶ 30]. The Committee's minutes dated November 4, 2015, show that the Committee agreed to remove Dr. Doe's matter from the agenda and conduct 100% review for timeliness of medical documentation upon Dr. Doe's return from his medical

leave of absence.  Again, this was not an adverse clinical privileges action and it is not the type of action that would result in an adverse NPDB report against the physician.

On March 20, 2016, Dr. Doe informed the Medical Staff Office/Credentials Committee of PGH that he desired to return from his medical leave of absence (having had his medical problem successfully completed) and would be resuming work at PGH.  [Dkt. No. 1, ¶ 32].

On April 1, 2016, PGH's Director of the Medical Staff informed Dr. Doe that he needed to apply for reinstatement to PGH's Credentials/Ethics Committee before resuming work.  [Dkt. No. 1, ¶ 33].  On June 9, 2016, Dr. Doe informed the Committee that he was requesting reinstatement of his hospital privileges.  On June 15, 2016, the Committee informed Dr. Doe that it requested his attendance before the Committee.  [Dkt. No. 1, ¶ 34].  On July 13, 2016, Dr. Doe submitted a letter of resignation of his medical staff membership and clinical privileges at PGH.  [Dkt. No. 1, ¶ 37].

At no point during this process was Dr. Doe provided a hearing or notice of a hearing regarding his clinical privileges. [Dkt. No. 1, ¶ 36].

When a statute does not define a term, the Court must presume that Congress intended to give the term its ordinary meaning.  *Doe v. Rogers*, 139 F. Supp. 3d 120 (D.D.C. 2015). In the present case, none of the applicable statutes define what an "investigation" is or means.

Black's Law Dictionary defines "investigation" as:  "The activity of trying to find out the truth about something."  Black's Law Dictionary (11th ed. 2019).

In Dr. Doe's case, the inquiry was concerning the timeliness of Dr. Doe's medical records. According to the Black's Law Dictionary definition, this could be defined as an "investigation." The results of the "investigation" revealed that Dr. Doe was not completing his medical records in a timely manner. This "investigation" ended and was over when the Committee placed Dr. Doe on a 100% review of his medical records, after concluding that Dr. Doe required additional monitoring. This was the Committee's final decision. Such a determination is a final "professional review action" as defined at 42 U.S.C. § 11151(9). This was not an adverse action against Dr. Doe's clinical privileges and was not reportable to the NPDB. This all happened <u>before</u> Dr. Doe took his medical leave of absence and long before he resigned from the hospital.

According to the NPDB Guidebook, for reporting purposes, an investigation runs "from the start of an inquiry until a final decision on a clinical privileges action is reached." U.S. Department of Health and Human Services, Health Resources and Services Administration, NPDB Guidebook, 2015, at E-34. In Dr. Doe's case, the inquiry started when the Committee began reviewing Dr. Doe's medical records for timeliness. PGH's inquiry ended with a final professional review action decision on September 16, 2015, when the Committee placed Dr. Doe under 100% record review. That was the only action taken; however, it was not a type of action that is considered to affect a doctor's clinical privileges or to be reportable. He went on medical leave of absence on October 13, 2015. The "investigation" was completed before Dr. Doe resigned his clinical privileges on July 13,

2016, and should not have been reported to the NPDB as <u>he did not resign while under</u> <u>investigation</u>.

A violation of the record timeliness policy while under continued peer review might possibly have given rise to an entirely new action or "investigation," but the prior "investigation" and action had been completely concluded at the time he resigned.

The statutes and rules governing NPDB reports do not authorize the reporting of a medical staff's "collegial" performance improvement reviews, such as the one taken in Dr. Doe's case. Reporting professional review actions to the NPDB is only authorized when those actions "adversely affect" a physician's clinical privileges. 42 U.S.C. § 11151(1).

Here, PGH and the Committee did not impose any adverse action against Dr. Doe's clinical privileges. Regardless, Dr. Doe was not under "investigation" at the time he resigned from PGH.

III. **HHS Exceeded its Statutory Authority in Promulgating 45 C.F.R. § 60.21(c) and in Issuing the NPDB Guidebook**

A. **Specific Violations of Federal Law Alleged in Count I**

Count I of the Complaint alleges DHHS exceeded its statutory authority in promulgating 45 C.F.R. § 60.21(c) and issuing the NPDB Guidebook. Dr. Doe specifically challenges the portion of 45 C.F.R. § 60.21(c) which reads:

> The Secretary will only review the accuracy of the reported information, and will not consider the merits or appropriateness of the action *or the due process that the subject received*.

(Emphasis added).

HHS's relegation of the due process afforded a physician by the reporting entity to the status of "not even worthy of consideration" is in direct violation of HCQIA's due process provisions located at 42 U.S.C. § 11112 et seq.

As to the Guidebook, it is a non-rule policy promulgated in violation of the Administrative Procedure Act's notice and comment rulemaking procedures. *See* 5 U.S.C. § 551 et seq. At specific issue in this case are two Guidebook provisions. First is the Guidebook's legitimizing adverse action reports against physicians who had no knowledge of a pending action against them, in direct violation of their due process rights guaranteed by the U.S. Constitution and HCQIA. Second, Dr. Doe challenges the limitless definition of the term "investigation" adopted by DHHS through the guidebook. That definition is:

> NPDB interprets the word "investigation" expansively. It may look at a health care entity's bylaws and other documents for assistance in determining whether an investigation has started or is ongoing, but it retains the ultimate authority to determine whether an investigation exists. The NPDB considers an investigation to run from the start of an inquiry until a final decision on a clinical privileges action is reached. In other words, an investigation is not limited to a health care entity's gathering of facts or limited to the manner in which the term "investigation"is defined in a hospital's bylaws. An investigation begins as soon as the health care entity begins an inquiry and does not end until the health care entity's decision making authority takes a final action or makes a decision to not further pursue the matter.

U.S. DHHS, Health Resources and Services Administration, NPDB Guidebook (April 2015), p. E-34.

Dr. Doe alleged in the Complaint that the Guidebook constitutes a "rule" as defined by 5 U.S.C. § 551(4). In addition to the Guidebook's definition of "investigation," the Complaint alleged that the Guidebook also contains a policy depriving a physician of his right to notice:

> **Nonrenewals**
>
> Nonrenewals of medical staff appointment or clinical privileges generally should not be reported to the NPDB. However, if the practitioner does not apply for renewal of medical staff appointment or clinical privileges while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or not taking a professional review action, the event is considered a surrender while under investigation and must be reported to the NPDB. <u>These actions must be reported regardless of whether the practitioner was aware of the investigation at the time he or she failed to renew the staff appointment or clinical privileges. A practitioner's awareness that an investigation is being conducted is not a requirement for filing a report with the NPDB.</u>

U.S. DHHS, Health Resources and Services Administration, NPDB Guidebook (April 2015), p. E-33 (emphasis added).

**B.** **Defendant's Application of 45 C.F.R. § 60.21(c) and the NPDB Guidebook Violate Federal Law**

    **1.** **45 C.F.R. 60.21(c) Exceeds DHHS' Statutory Authority Under HCQIA**

Congress enacted HCQIA "both to provide for effective peer review and interstate monitoring of incompetent physicians and to grant qualified immunity from damages for those who participate in peer review activities." *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992);  42 U.S.C. § 11101.  Congress assumed HCQIA's goals could be accomplished "through effective professional peer review," with specified due process.  42 U.S.C. §§ 11101, 11111-11112.  To give effect to the statutory purposes regarding effective peer review, the act defined minimum standards for the process.  *See* 42 U.S.C. § 11112.

In the Motion to Dismiss, Defendant charges Dr. Doe with "the inaccurate belief that the HCQIA mandates that a provider be provided a hearing prior to a hospital or doctor submitting a report to the NPDB." [Dkt. No. 9, p. 14].  Defendant goes on to say that the hearing standards contained at 42 U.S.C. § 11112 are merely part of an immunity safe harbor for hospitals and not a statutory requirement. [*Id.*].

Dr. Doe's "belief," however inaccurate Defendant thinks he may be, finds support in the plain language of HCQIA.  Congress directed DHHS to establish guidelines to:

> Assist the professional review bodies in meeting the <u>standards</u> described in section 11112(a) of this title.

42 U.S.C. § 11114 (emphasis added).

Section 11112(a) requires professional review action be taken only "after adequate notice and hearing procedures are afforded to the physician involved. . . ."  42 U.S.C. § 11112(a)(3).  This Section goes on to describe what adequate notice and hearing means.  Nowhere in that section, or in any other, does the HCQIA state notice and hearing procedures are optional, or only for immunity purposes.  It is telling that Congress used the word "standards" when referring to the notice and hearing provisions in Section 11112.  Referring to something as a "standard," in common English, means it is not optional.

A part of Congress' intent in enacting the HCQIA was that physicians "receive fair and unbiased review to protect their reputations and medical practices" H.R. Rep. No. 99-903, 99th Cong., 2d Sess. 10, 11 (1986).  Arguing that HCQIA (and, specifically, the notice and hearing procedures in 42 U.S.C. § 11112) exists only to give effect to the immunity provisions of the Act, is to read the Act far too narrowly.  HCQIA has a broader purpose.  While the immunity provision is an important part of its purpose, the Act also serves to balance the "concerns for protecting physicians improperly subjected to disciplinary action" and preserve "causes of action for injunctive or declaratory relief for aggrieved physicians."  *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1322 (11th Cir. 1994).

HCQIA, then, is a two-way street.  It offers protections to both physicians and hospitals.  The NPDB report is intended to reflect the culmination of the balance struck between physicians' rights to be free from sham disciplinary proceedings, and the chilling effect unrestricted litigation by physicians had on peer review bodies.  After all, if the purpose

of the NPDB report is to notify hospitals of potentially incompetent physicians' history, there should be some measure of officiality to the proceedings which lead to the report. Allowing data bank reports to stay without paying so much as lip service to due process is contrary to Congress' intent in enacting HCQIA. But, that is precisely the government's position in this case. Put succinctly, Defendant can see no set of circumstances, no matter how egregious, where DHHS would void the adverse action report of a hospital when the physician claims a lack of due process during peer review.

DHHS codified its position in 45 C.F.R. § 60.21(c) when it made it the agency's official legal stance that Secretarial Review would intentionally and systematically avoid even considering "the appropriateness of the [peer review] action or the due process that the subject received." 45 C.F.R. § 60.21(c). Such a position is in direct contravention of the rulemaking authority granted by Congress in 42 U.S.C. §§ 11114 & 11136, and avoids the agency's responsibility to review reports for accuracy as mandated by 42 U.S.C. § 11136(2). Consequently, Defendant's request to dismiss Count I should be denied.

> **2.      Defendant's Refusal to Review Whether a Hospital Provided a Physician on its Medical Staff with Due Process Is an Unlawful Delegation of Congressional Authority to a Private Entity**

Congress directed the Secretary to establish voluntary guidelines "after notice and opportunity for comment." 42 U.S.C. § 11114. The Secretary established regulations in 45 C.F.R. § 60.1 *et seq.,* but then, without notice and comment, created an extensive Guidebook with appendices, totaling more than 230 pages, defining terms in the regulations, and

describing procedures, policies, and giving "example" questions and answers. The Guidebook is publicly available on the Internet at https://www.npdb.hrsa.gov/resources/about-Guidebooks.jsp.

The Guidebook, however, is contrary to Congress' stated purpose in several ways. Most notable, and particularly relevant to this case, is the agency's policy of accepting as valid the reports of privilege surrenders, non-renewals, and resignations when a physician does not even know he is under investigation.  Such reports plainly require the Court to accept the bizarre notion that HCQIA does not guarantee peer review proceedings have any due process.

The NPDB Guidebook was seemingly designed to reduce DHHS's administrative burden by limiting factual reviews in the above-cited areas (and others).  However, DHHS's regulatory load-lightening of its own statutorily-required duties comes at the expense of physicians' due process rights and the general principles of fairness to those who are reported.

Defendant's Motion to Dismiss is firmly rooted in DHHS's pursuit of administrative convenience by repeatedly stating the agency is ill-positioned to make factual determinations of the underlying issues and that the NPDB is "primarily an alert or flagging system" not concerned with considerations like: whether due process was afforded by the reporting agency; the subject's knowledge of any of the purportedly adverse facts or procedural steps undertaken by the reporting agency; or even the accuracy of the information submitted by the reporter. [Dkt. No. 9, p. 5].

In critical areas like assuring due process both at the hospital level and in the Secretarial Review, the Guidebook makes clear that DHHS's firm policy position is that the NPDB does not undertake any due process review of adverse reports. U.S. DHHS, Health Resources and Services Administration, NPDB Guidebook (April 2015), p. F-5 (stating whether the physician received due process is an issue to be resolved "between the subject of the report and the reporting entity").

Defendant characterizes HCQIA as having a single overriding purpose; immunizing those entities that report bad doctors and creating a repository for reports of the trials and tribulations of those bad doctors. [Dkt. no. 9, p. 14]. As discussed above, HCQIA is more than the NPDB. It is true that HCQIA is a sword to be used against bad physicians. But, it is also a shield to be used by good doctors to defend themselves from kangaroo peer review actions. As the Ninth Circuit pointed out in *Austin v. McNamara*, HCQIA was enacted to provide for effective peer review <u>and</u> to monitor troubled physicians. *Austin*, 979 F.2d at 733.

Where Defendant strays from the law is in deciding that effective peer review is optional to the point that the agency can, when faced with a request to remove an adverse action report, deny the request and wash its hands of patent fundamental due process errors. Ignoring the conduct of the reporting entity constitutes an unlawful delegation of DHHS's statutory responsibility to ensure adequate peer review to a private party.

The non-delegation doctrine prevents the delegation or sub-delegation of Congressional authority to a private party. *See Carter v. Carter Coal Co.*, 298 U.S. 238 (1936)(holding the

delegation of the authority to create coal districts to private parties was unconstitutional).  In *Carter Coal*, the Supreme Court determined that the creation of a private coal commission and the delegation to it of the authority to create coal districts to oversee the industry were improper.  *Id.*  Within each district, producers of two-thirds or more of the coal and one-half or more of the miners employed were empowered to set wages which would be binding on all producers in that district.  *Carter*, 298 U.S. at 283-84.  Further, producers of two-thirds or more of the national output of coal and one-half or more of the miners employed nationally were permitted to set maximum hours for miners.  *Id.*  The Supreme Court found this setup violated the non-delegation principle stating the discretion conferred to private entities, that would then be enforced by the state, was an unjustifiable interference with liberties deemed fundamental under substantive due process.  *Id.*, at 311.

The limits of non-delegation defined in *Carter Coal* can be contrasted with the Court's decision *vis-a-vis* another act passed by Congress in 1935, the Tobacco Inspection Act.  There, the law created a system by which regulations promulgated by the Department of Agriculture were only effective after being approved by a two-thirds majority of private tobacco growers affected thereby.  *Currin v. Wallace*, 306 U.S. 1, 5-8 (1939).  For the Court, the distinction, albeit a fine one, between the unlawful delegation in *Carter Coal* and the valid one in *Currin* was that *Carter Coal* involved a mandate created by private parties and enforced by the government.  *Currin*, in contrast was permissible because the mandate was created by the government and only became effective with the consent of the private parties.  *Id.*, at 15-16.

Basically, a public mandate approved by private parties is permissible, but a private mandate enforced by the government is not.

Congress set out specific due process procedures for peer review in 42 U.S.C. § 11112. It then gave DHHS the authority to promulgate rules that would assist hospitals in providing the due process dictated by Congress. 42 U.S.C. § 11114. Instead of assisting professional review bodies, DHHS has shirked its responsibility to oversee the peer review process altogether. By refusing to evaluate the due process afforded a physician appealing an adverse action NPDB report, DHHS has delegated all due process decisions and authority to private entities.

DHHS's delegation of something as essential as safeguarding due process to the vagaries of hospital medical staffs whose decisions are so often swayed by personal animus, hospital politics, or economic concerns demonstrates a veritable disregard for its charge under HCQIA. That kind of regulatory self-absolution is exactly the kind of improper delegation the Supreme Court found invalid in *Carter Coal*.

By actively avoiding a determination, or even a superficial analysis, of the sufficiency of reporting entities' due process practices, DHHS's Secretarial Review is little more than a proverbial "rubber stamp" approval of hospital actions.

3.     **The NPDB Guidebook is an Unpromulgated Rule in Violation of the Administrative Procedure Act**

According to the Administrative Procedure Act, a rule is:

> "Rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . .

5 U.S.C. § 551(4).

The NPDB Guidebook is replete with substantive policies that have general applicability to all entities required to report to the NPDB and those that are subject to those reports. In fact, Defendant unashamedly relied upon the NPDB Guidebook's policies in the Secretarial Review decision, citing it more than a dozen times. [Dkt. No. 1, Exh. 3].  For good measure, Defendant's Motion to Dismiss continued the trend citing the Guidebook at least ten (10) times. [Dkt. No. 9].

To the extent it informed the agency's decision below, DHHS's interpretation of, and reliance on, the Guidebook is not entitled to deference of any kind and constitutes an invalid exercise of executive authority.  The First Circuit, in *Doe v. Leavitt*, 552 F.3d 75 (1st Cir. 2009), specifically found that the Guidebook was not a properly promulgated rule.  There the Court explained:

> The Guidebook is an agency manual.  It is not a product of notice-and-comment rulemaking, nor was it ever published in the Federal Register, which makes only a glancing reference to it, see Notice Announcing Opening Date of NPDB, 55 Fed. Reg. 31,239-01 (Aug. 1, 1990). Given these facts, we do not believe that the Guidebook is entitled to *Chevron* deference.

*Leavitt*, 552 F.3d at 80.

Defendant relied on the Guidebook for substantive decision making in this case.  The Guidebook meets the definition of a Rule under the Administrative Procedure Act and was not properly promulgated through the notice and comment rule-making procedures prescribed by the act.  Consequently, the Secretarial Review decision should be reversed because its reasoning is inextricably intertwined with non-rule policies contained in the Guidebook.

**IV.    The Court Has Jurisdiction to Hear Dr. Doe's Due Process Claims**

**A.    Count II does not Assert a Private Right of Action Under HCQIA**

Defendant makes a facial attack on the Court's jurisdiction to hear the due process claim brought by Dr. Doe in Count II of the Complaint. [Dkt. No. 9, p. 8].  Defendant argues that Count II amounts to Dr. Doe bringing a claim against DHHS for a violation of his due process rights committed not by DHHS, but by PGH.  That characterization is inaccurate.  Dr. Doe brings a due process claim against DHHS, not solely because PGH failed to advise him that he was under "investigation" or because PGH did not give him notice and a hearing.  Dr. Doe brings Count II because DHHS has a responsibility to review the actions of hospitals when evaluating adverse NPDB reports, a task DHHS wholly failed to do.

As a threshold matter, Defendant contends HCQIA provides no private right of action, such that Count II fails in the first instance.  However, Defendant misreads the Complaint and disregards court precedent.  While it may be true that the resolution of Count II necessarily involves interpreting provisions of HCQIA and its implementing regulations, the premise that

Dr. Doe asserts a private right of action under HCQIA is not supported by the Complaint. *See Walker v. Mem. Health Sys.*, 231 F. Supp. 3d 210, 214 (E.D. Tex. 2017) (" . . . the doors of the courts remain open to doctors who are subjected to unjustified or malicious peer review. . . .") (citing *Poliner v. Tex. Health Sys.*, 537 F.3d 368, 381 (5th Cir. 2008)).

The Secretarial Review process is agency action that affects the substantial interests of physicians seeking review of adverse NPDB reports. *See Cerciello v. Sebelius*, 2016 U.S. Dist. LEXIS 43314, *13-15 (E.D. Pa. Mar. 30, 2016). HCQIA and the implementing regulations prescribe the procedures which DHHS must follow in reviewing and passing on disputed adverse NPDB reports. Dr. Doe, in Count II, charges Defendant with failing to provide him with adequate due process during Secretarial Review when the agency failed to adequately consider facts and circumstances that called into question whether his resignation was reportable under HCQIA.

## A.   The HCQIA Does Not Require NPDB Reports be Made Without Physician's Knowledge of Pending Investigation

Court sanctioned wilful blindness to injustice is an anathema to the notion of due process. What makes Defendant's interpretation of HCQIA especially troubling is that it is not the result of some legislative mandate that needs to be corrected through law making. Defendant's interpretation of the HCQIA is a completely voluntary regulatory scheme based largely on the NPDB Guidebook, a set of agency policies that was released without notice and comment, in violation of the Administrative Procedure Act.

Congress directed DHHS to promulgate regulations that provide for "procedures in the case of disputed accuracy of the information" reported to the NPDB. 42 U.S.C. § 11136. Nowhere did Congress define what the term "accuracy" meant with respect to disputes, or give any direction on the scope of a review for accuracy.  DHHS defined that term in an unduly narrow fashion when it promulgated 45 C.F.R. § 60.21(c), and the NPDB Guidebook.  Those publications, as alleged in Count II, result in Defendant's creation of a regulatory scheme which results in deprivation of a physician's due process rights with no recourse whatsoever.

A baseline premise for Defendant's position in this case is that the requirement that a physician to have knowledge of an investigation "would mean that no reporting would occur, thereby frustrating the very purposes of [HCQIA]." *Rodgers*, 139 F. Supp. 3d at 147.  In dicta in *Rodgers*, the District Court opined that requiring notice to the physician would be problematic because the parties could be mistaken about whether their actions cause a reportable event, or that they later learn that the actions taken did constitute an investigation which should have triggered a reporting obligation.  *Id.*  Thus, the court concluded, an otherwise reportable event would go unreported if the physician was supposed to be noticed but was not.  The court's solution to a problem not really even *sub judice* was to sacrifice any semblance of due process on the altar of broad reportability.

On the surface, the district court's reasoning seems sound.  However, it ignores the simplest solution.  If the hospital were to discover after the fact that it was incorrect about whether a resignation or non-renewal was actually during what should have been considered

an "investigation," the hospital can simply contact the physician, advise him/her of the error, and initiate the peer review process.  What should not happen is that an NPDB report is made some months (or possibly years) later without any recourse for the physician.

One need only look at the facts of the *Rodgers* case to see the incredibly unjust nature of the "report at all costs" scheme.  The physician in *Rogers* had a significant claim that his resignation was induced by fraud and concealment.  *Rodgers*, 139 F. Supp. 3d, at 147-48.  Despite what appeared to be uncontroverted evidence of a fraudulent inducement, the *Rodgers* court concluded that the only thing DHHS should be concerned with is the "accuracy" of the report.  *Id.* at 148.  The only apparent responsibility the agency had was to determine if there was a resignation at the same time there was an investigation, not whether the resignation was procured by false statements or outright fraud. *Id.*  Following *Rodgers* results in approval of a system that is emblematic of what it means to have a complete lack of due process.

**B.** **Defendant's Position that Knowledge of a Pending Investigation is Irrelevant to Reporting a Voluntary Surrender is Contrary to the Purpose and Intent of HCQIA and Violative of Due Process**

As discussed above, the NPDB Guidebook states that a physician need not have any knowledge of an ongoing investigation at the time he resigns or fails to renew his hospital credentials. U.S. DHHS, Health Resources and Services Administration, NPDB Guidebook (April 2015), p. E-33.  First, the NPDB Guidebook is an unlawfully promulgated rule upon which the agency should not be permitted to rely or make findings. [*See* Section III.B.3, above].  Second, courts have found that Secretarial Review of cases involving reports for

voluntarily relinquishing or resigning hospital clinical privileges must include a review of evidence presented by the physician which calls into question the alleged voluntariness of the resignation or relinquishment.  *See Long v. U.S. Dep't of Health & Human Servs.*, 2019 U.S. Dist. LEXIS 198891 *12-13 (D.D.C. Nov. 15, 2019); *Rodgers*, 139 F. Supp. 3d, at 148-49.

The District Court for the District of Columbia articulated the standard in *Long* as follows:

> Thus, if a report describes a doctor's resignation as "voluntary" but the doctor puts forth "actual evidence" that a "reasonable mind might accept as adequate to support the conclusion that [the doctor's] resignation was obtained by fraud," then HHS must "properly consider this evidence" and "set forth [its] rationale for" accepting or rejecting it.

*Long*, 2019 U.S. Dist. LEXIS, at *12.

An integral part of whether an individual's act is voluntary, especially when it involves the waiver of a legal right (in this case the right to notice and a hearing), <u>requires</u> that the individual has some knowledge of the rights that are waived.  *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994).  The elements of the waiver:

> (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) <u>the actual or constructive knowledge of the right</u>; (3) and the intention to relinquish the right.

*Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223 (M.D. Fla. 2018) (citing *Leonardo v. Sate Farm Fire & Cas. Co.*, 675 So. 2dd 176, 178 (4th DCA 1996) (emphasis

added));  *see also Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098 (5th DCA 2006); *Progressive Express Ins. Co. v. Camillo*, 80 So. 3d 394, 400 (Fla. 4th DCA 2012); *Hancock Bank v. Nichols Creek Dev., L.L.C.*, 2015 U.S. Dist. LEXIS 172592, at *16 (M.D. Fla. Dec. 29, 2015);  *Encore Enters. v. Roberts Hotels Ft. Myers, LLC*, 2011 U.S. Dist. LEXIS 125618, at *12 (M.D. Fla. Oct. 31, 2011).

Dr. Doe cannot be found to have waived his right to notice and a hearing when he had no knowledge of a pending investigation that would have given rise to such hearing rights. The fact that a physician is, through no fault of his own, without knowledge of a pending investigation cannot, as a matter of law, give rise to a valid waiver of his right to due process.

This approach is consistent with the legislative intent of HCQIA.  The legislative history of the Act states that the reason for requiring reports of a physician's resignation or surrender of privileges while under investigation was to ensure that health care entities would not resort to "plea bargains" in which a physician agrees to a surrender or "non-renewal" in return for the health care entity's not filing a report with the NPDB about the circumstances. H.R. Rep. No. 99-903, 99th Cong., 2d Sess., at 2.  Congress' concern over the circumvention of HCQIA's reporting requirements through so-called "plea bargains" presumed that the physician would have knowledge of the investigation and the hospital's obligation to report him.  Otherwise, there would be no need for concern about confidential settlements between the parties.

The legislative history makes it clear that the only purpose of requiring reporting of voluntary resignations was to prevent physicians under investigation from agreeing to a

surrender of clinical privileges in exchange for a *quid pro quo* from the hospital.  It follows that the resignation of a physician who has no knowledge of a pending investigation was not contemplated by Congress in its enactment of the language in 42 U.S.C. § 11133(a)(1)(B)(i) regarding acceptance of surrenders while under investigation.   When DHHS conducts Secretarial Review pursuant to NPDB Guidebook page E-33 without any regard for whether the physician had knowledge of a pending investigation, it exceeds its statutory authority and acts in an arbitrary and capricious manner.

## V.    The Complaint States a Valid Claim for Relief Under the Privacy Act

The Court cannot determine the merits of Dr. Doe's Privacy Act claim until it determines the validity of Count III of Dr. Doe's Complaint.   Count III alleges that the NPDB's Guidebook exceeds the NPDB's statutory authority and that the Guidebook, in fact, promulgates rules and definitions without the federal agency's having undertaken formal rulemaking process.  The Court cannot make a decision on the Privacy Act until it determines whether 45 C.F.R. § 60.21 is valid.

Defendant cites to *Sabatini v. Price* as the basis for its argument that the NPDB is excluded from application of subsections (d)(1)-(4) of the Privacy Act.  However, this was not what the court in *Sabatini v. Price* decided or held.  The court in *Sabatini v. Price* dismissed the action because the plaintiff had filed his complaint after the two (2) year statute of limitations for filing a Privacy Act claim had run.  *Sabatini v. Price*, 2018 WL 1638258 (S.D. Cal. Apr. 5, 2018), *Sabatini v. Azar*, 749 F. App'x 588 (9th Cir. 2019).  The present case

presents no such issues.  Plaintiff timely filed the present suit against Defendant well within the statute of limitations time period for the Privacy Act.

The purpose of the Privacy Act is as follows:

> This part also establishes agency policies and procedures under which a subject individual may be given notification of or access to a record pertaining to him and policies and procedures under which a <u>subject individual may have his record **corrected or amended**</u> if he believes that <u>his record is **not accurate**</u>, timely, complete, or relevant or necessary to accomplish a Department function.

45 C.F.R. § 5b.2(a) (emphasis added).

45 C.F.R. § 60.21 provides the mechanism by which an individual listed on the NPDB can challenge the factual accuracy of the information in their report.  The regulation states:

> The Secretary will only review the accuracy of the reported information, and will not consider the merits or appropriateness of the action or the due process that the subject received.

45 C.F.R. § 60.21(c)(1).  Dr. Doe's issue with the Privacy Act and 45 C.F.R. § 60.21 is that the NPDB, a division under the DHHS, does not follow either of them when reviewing appeal decisions.  Mr. Matthew Wiley, Branch Chief of the Policy and Disputes Branch of the Division of Practitioner Data Bank (NPDB), informed Dr. Doe that, for the NPDB's purposes, a 100% peer review of a practitioner's medical records constitutes an investigation.  However, a 100% peer review of a practitioner's records is not actually an "investigation" into that practitioner's ability to practice.  What Dr. Doe was required to do was merely to have his future records monitored for timeliness requirements;  there was no restriction or limitation

of any kind placed on his clinical privileges.  Furthermore, any "investigation" had previously concluded as shown above.

In its Guidebook, the NPDB expanded the definition of the word "investigation" to include "any" action a hospital may take against a physician.  This far exceeds what the legislation established in HCQIA and is, in fact, contrary to that legislation.  Because of this unauthorized, over-expansive interpretation by DHHS in the NPDB Guidebook, review decisions by the NPDB are essentially "rubber stamp" approvals of any reports which hospitals submit to the NPDB;  the accuracy of the reports is not considered.  Therefore, Defendant DHHS's interpretation goes against the purpose of the Privacy Act and 45 C.F.R. § 60.21.

If Defendant's arguments are correct under DHHS's interpretation, the NPDB simply allows hospitals to determine what constitutes peer review, due process, and the facts (whether correct not) of the report.  This occurs without the hospital's providing the physician with any notice or rights in the matter.  Once the hospital makes the report to the NPDB, the NPDB simply acts as the "repository" for any and all such reports filed by hospitals, regardless of their accuracy or veracity.  Therefore, the NPDB would be operating without the accountability required by both 45 C.F.R. § 60.21 and the Privacy Act.  Because, according to the arguments of the Defendant, the NPDB does not evaluate the accuracy of what is reported, the NPDB must, *per se*, be keeping inaccurate records in a federal database, publishing and republishing that false, incorrect information on citizens, without any right for citizens to correct them.

**VI.**    **Claims for Injunctive Relief and Declaratory Judgment Can Be Pleaded as Separate Causes of Action**

The cases cited by Defendant do not support the argument that claims for injunctive relief and declaratory judgment should be dismissed.  In *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, the court stated:

> While Plaintiff may certainly request injunctive relief as a remedy where appropriate, there must be an underlying claim upon which to base the request.

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1289 (M.D. Fla. 2009).  In the present case, this Court must determine whether the underlying claims are valid before determining the validity for a request for injunctive relief.

In *Griffin v. Lee Cty. Bd. of Educ.*, the court:

> dismissed the Plaintiffs' "claims" for declaratory and injunctive relief with prejudice on the ground that, in the absence of any valid underlying substantive claim for violation of the Plaintiffs' rights, those purported "claims" could not, as a matter of law, give rise to a cause of action.

*Griffin v. Lee Cty. Bd. of Educ.*, 2019 LEXIS 205732, at *4 (M.D. Ala. Mar. 25, 2019).  In the present case, there has been no determination as to the validity of Dr. Doe's underlying substantive claims.  Therefore, because there is no absence of any valid underlying substantive claim, the claims for injunctive relief and declaratory judgment should not be dismissed.

This Court in the past has construed causes of action for injunctive relief and declaratory relief as remedies.  In *Burke v. Johnson*, the court stated:

> That is not to say, however, that Plaintiff cannot request declaratory relief with regard to its uninsured motorist claim, and the Court construes Plaintiff's attempt to state a claim for declaratory judgment as requesting such relief.

*Burke v. Johnson*, 2016 WL 9503732, at *3 (M.D. Fla. June 27, 2016).  Similarly, in the present case, Dr. Doe's causes of action for injunctive relief and declaratory relief should not be dismissed.

Defendant's argument is akin to the argument raised in *Walker v. Mem'l Health Sys.* in which a doctor sued the hospital at which he formerly had clinical privileges for injunctive relief.  In that case, the court stated:

> As a threshold matter, the Hospital contends that the Court lacks authority to issue a preliminary injunction because HCQIA does not provide a private right of action.  <u>In pursuing this argument, the Hospital misreads the complaint</u> and disregards binding Fifth Circuit precedent.
>
> First, Dr. Walker's claims <u>are not brought as a private right of action under HCQIA</u>.  Dr. Walker's complaint states the following causes of action: (1) business disparagement; (2) tortious interference with contract and prospective business relations; (3) racial discrimination under 42 U.S.C. § 1981; (4) breach of contract; and (5) declaratory judgment under 28 U.S.C. §§ 2201-2202.  <u>While it is true that the resolution of this case necessarily involves interpreting provisions of HCQIA, the premise that Dr. Walker is asserting a private right of action under HCQIA is not supported by the complaint.</u>

*Walker v. Mem'l Health Sys.*, 231 F. Supp. 3d 210, 214 (E.D. Tex. 2017) (emphasis added). Similarly, this case presents several causes of action, other than a claim under HCQIA, that justify Dr. Doe's request for injunctive and declaratory relief.

**VII.**   <u>Conclusion</u>

The Defendant has not moved to dismiss Count III of the Complaint;  therefore, it should remain as unchallenged.  For the reasons stated above, including the fact that the other Counts in the complaint are inextricably interwoven with the validity of the allegations made in Count III, the Court should deny the Motion to Dismiss as to the remaining Counts.  Dr. Doe respectfully requests the Court enter an order denying Defendant's Motion to Dismiss as to all counts.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that I have filed this document electronically with the Clerk of Court via the CM/ECF System, which automatically serves all counsel of record, this 18th day of February 2020.

/s/  George F. Indest III
_____
**GEORGE F. INDEST III, J.D., M.P.A., LL.M.**
Florida Bar No.:  382426
Primary e-mail:  GIndest@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
**LANCE O. LEIDER, J.D., LL.M.**
Florida Bar No.:  96408
Primary e-mail:  LLeider@TheHealthLawFirm.com
Secondary e-mail:  CourtFilings@TheHealthLawFirm.com
TRIAL COUNSEL/LEAD ATTORNEY
ATTORNEY TO BE NOTICED
**THE HEALTH LAW FIRM**

1101 Douglas Avenue
Altamonte Springs, Florida 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030
**ATTORNEYS FOR PLAINTIFF**